UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MARY SLIGAY,

    Plaintiff,                                       Civil Action No. 19-CV-10802

vs.                                                HON. BERNARD A. FRIEDMAN

THE KROGER CO.,

    Defendant.
_____/

**OPINION AND ORDER DENYING
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

This matter is presently before the Court on defendant's motion for summary judgment [docket entry 12]. Plaintiff has responded and defendant has replied. Pursuant to E.D. Mich. LR 7.1(f)(2), the Court shall decide this motion without a hearing. For the reasons stated below, the Court shall deny the motion.

This is an employment discrimination case in which plaintiff alleges that her former employer, defendant The Kroger Company ("Kroger"), discharged her because of her gender and age (sixty years old) in violation of Michigan's Elliott-Larsen Civil Rights Act. Kroger contends that it discharged plaintiff, who was working at the time at its Taylor store ("store 686") as a "direct store delivery receiver," or "DSD receiver," because she violated a work-place rule prohibiting employees from purchasing Kroger products while on the clock and a rule concerning how unsold products are to be disposed of. Subject matter jurisdiction is based on diversity: plaintiff resides in Wayne County, Michigan, while defendant is an Ohio corporation whose principal place of business is in Cincinnati.

Plaintiff worked for Kroger for thirty-eight years. Her delivery receiver job

required her to accept deliveries from vendors, keep the back room organized, and sort damaged and unsalable items into piles for either trash, returns, or donations. While defendant portrays her as a problem employee by attaching copies of various "write-ups" over the years (Def.'s Exs. 4-18), all of these were for minor incidents such as being tardy or not properly "calling off" for work. Plaintiff's annual performance evaluations for 2012-2014, the only ones the parties have submitted, indicate that in those years she was "exceeding expectations."

It appears that plaintiff's recent problems began in November 2017 when a new store manager, Todd Grossman, arrived at the Taylor store. Plaintiff found him to be verbally abusive and unfriendly. Plaintiff testified she felt that Grossman "belittled" her and "acted like . . . I wasn't capable of doing the job." Pl.'s Dep. at 46. Shortly after Grossman arrived, plaintiff "knocked on his door, and I just wanted to greet him and tell him, you know, nice to have him there, anything I could do, I'd be more than willing to help. He looked at me and said, 'I got it.'" *Id.* at 47. Plaintiff felt this showed Grossman was not treating her as a member of the team. On another occasion, in January 2018, plaintiff returned from vacation and was chastised by Grossman because the back room area, which was plaintiff's responsibility to maintain, was messy. Grossman asked plaintiff "when do you think you're going to get this mess cleaned up" and demanded that she do so that day. *Id.* at 48.

This perceived mistreatment by Grossman prompted plaintiff to make a telephone call to a Kroger hotline in early January 2018. Plaintiff complained of his "bullying and demeaning" language. Pl.'s Ex. 10. Plaintiff recounted the "messy back room" incident and stated that Grossman "regularly uses a demeaning tone and aggressive body language when confronting employees, often intimidating them to do what he wants." *Id.* Plaintiff also

indicated that a union representative had confronted Grossman about the messy back room incident and asked him if he "was willing to lose a good employee as a result of the incident," to which Grossman responded, "I don't care." *Id.*

At about the same time, plaintiff sent a letter to Grossman and "Kroger Management" complaining about his treatment of her and others. Pl.'s Ex. 9. In addition to the two incidents mentioned above, plaintiff wrote that Grossman provided feedback that was "negative and degrading" and "hostile, belittling and demeaning," and that he communicated that her "ideas and solutions to improve were not welcomed."

Grossman did not respond to this letter, but it prompted an HR representative to convene a meeting later in January with plaintiff, Grossman, the zone manager, an HR representative, and a union representative. Pl.'s Dep. at 53. Plaintiff testified that after this meeting "things were a little bit better," but that Grossman continued making "snide remarks," such as "Do you think you're going to get your job done today?" *Id.* at 56. Plaintiff testified that she spoke with three other female employees (Joy and Laura in bakery, and Soni in the deli section) who likewise complained that Grossman criticized their work and "wouldn't get off [their] back." *Id.* at 58.

More trouble for plaintiff arrived in August 2018. The assistant manager, Hope Kowalczyk, was looking over the store's inventory reports and noticed "shrink" or "shrinkage," i.e., inventory that cannot be accounted for. She had heard rumors that employees on the night shift were bragging about stealing. She also found some products in the dumpster that did not belong there because they could have been marked down and sold. One of plaintiff's jobs was to sort through expired or damaged items brought to the back room from the various

3

departments. Edible items would be donated to Forgotten Harvest, and damaged or expired items would either be trashed or returned to the vendor for credit. All such items were supposed to be scanned by a hand-held scanner. Kowalczyk had found some items in the trash that had not been scanned.

Kowalczyk contacted Kroger's loss prevention manager, Damian Volante, about the shrinkage and he assigned an investigator, Darrius Burks, to look into things. Kowalczyk says she did not mention any employees' names, but Burks ended up focusing his attention on plaintiff. Volante later reported:

> I writer Damian Volante, . . . directed . . . Burks to investigate the DSD Receiver Mary Sligay at store #686 due to high shrink results along with a random audit/inspection on general best practices. Prior to, management at the store indicated a concern over product possibly being thrown away in the trash compactor that should have either been an attempted mark down or scanned out and sent in for Reclaim/donation in which the store receives a portion or credit.
>
> Various and random days when Sligay was reviewed by Burks from early July 2018 through August 17th 2018. On at least three dates (7/23, 7/27, and 8/7) Sligay was observed discarding various product that was clearly not scanned out nor attempted to have been verified as scanned out in the RF Handheld. On those examples, Sligay would be seen with a box of random unknown trash, then taking items placed in the damaged area (intended to be sorted through and scanned out or marked down according to the items condition), she would then place the items in the trash box. At no point would any scan out attempt be made. Other random pieces of trash would be thrown on top of the unscanned out product in an effort to conceal it before taking it outside to the trash compactor.
>
> Also found during Burks investigation was a clear pattern of personal purchases by Sligay while she was punched in for her shift. She would shop for the items and then purchase them while punched in, indicating a clear violation of the companies Employee Purchase Policy. Many of these transactions were

>   linked with Sligay's Kroger Plus Card . . . and some were not. Time clock punches, along with confirmed transactions are attached.
>
>   On 8/17/18 I (Volante) went to #686 and interviewed Sligay, also present was Assistant Manager Hope Kowalcyzk. . . . [Sligay] indicated a clear understanding of the policies and best practices that were associated with it. When asking her about throwing away the unscanned out items, Mary verbally stated that she likely had done so and that she was aware that the items should have been scanned out or marked down. The only explanation she offered for doing so was that she had been careless. When discussing the confirmed Employee Purchase Policy violations, Mary admitted that she had done so on many occasions and had realized that it was a significant policy violation.
>
>   . . . I informed her that due to the significant of what had occurred that two C.A.R.'s [Constructive Advice Records] were being issued to her. One related to the throwing away of produce without handling it according to the companies best practices and one for her multiple Employee Purchase Policy violations. Both had a corrective action of suspension, pending discharge. . . .

Def.'s Ex. 27. The "pending discharge" was turned into discharge effective the same day. Kroger states that it discharged plaintiff for the reasons stated by Volante. Pl.'s Ex. 2.

At her deposition, plaintiff testified that she scanned everything except possibly one package of tortilla shells that had been submerged in bleach, and she told one of the assistant managers that she was throwing it away for that reason. Pl.'s Dep. at 73. She admitted, both to Volante and at her deposition, that she had been purchasing items (usually something to drink) while on the clock and that this was a violation of company policy, but she claimed that she did so with the knowledge of management staff who would cover her workstation for her while she would "run up and get it." *Id.* at 74.

The Employee Purchase Policy is found on page 35 of the employee handbook. Def.'s Ex. 20. Among other things, the policy states: "All employee purchases are to be made

when the employee is off the clock." Plaintiff's union, the UFCW (United Food and Commercial Workers) has a notice on its webpage warning workers that "there is no amount of work ethic, seniority or clean work record that will get you off the hook of a purchase policy violation." Def.'s Ex. 21. While the union filed a grievance on plaintiff's behalf (regarding both CARs), Def.'s Ex. 30, it abandoned the grievance on September 10, 2018, stating: "[W]e have found no contractual violation, therefore, we have no basis to continue the grievance procedure." Def.'s Ex. 31.

The parties agree on the legal standards applicable in this case. Because plaintiff has no direct evidence of age or gender discrimination, the *McDonnell-Douglas* burden shifting analysis applies:

> Under that approach, an employee must initially demonstrate a prima facie case of age discrimination, which requires a showing that the employee was (1) a member of a protected class, (2) subject to an adverse employment action, (3) qualified for the position, and (4) other, similarly situated employees outside the protected class were unaffected by the adverse action.
>
> After the employee has satisfied the prima facie test, the burden of production shifts to the employer to articulate a nondiscriminatory justification for the adverse action. However, "even if that reason later turns out to be incredible, the presumption of discrimination evaporates." Once the employer has met its burden of production, the burden shifts back to the employee to ultimately prove discrimination. To prevail, the employee must submit admissible evidence to prove that the employer's justification for the adverse action was not the true reason for the action, and that the employee's age was a motivating factor in the employer's decision. "Thus, the employee must prove that the employer's explanation was a pretext for discrimination."
>
> An employee may establish pretext (1) by showing the employer's justification had no basis in fact, (2) if it has a basis in fact, by showing that it was not the actual factor motivating the adverse action, or (3) if it was a factor, by showing that it was insufficient

> to justify the decision. The proofs offered to support the prima facie case may be sufficient to create a triable issue of fact that the employer's justification is a pretext if the evidence would enable a reasonable factfinder to infer that the employer's decision had a discriminatory basis. "Ultimately, the plaintiff will have the burden of producing evidence, whether direct or circumstantial, that proves that discrimination was a determining factor in the employer's decision." In the context of summary disposition, "the evidence must create a material issue of fact on which reasonable minds could conclude that the employer's stated reason is a pretext for discrimination for summary judgment to be precluded."

*Drazin v. Binson's Hosp. Supplies, Inc.*, No. 312978, 2014 WL 231918, at *3 (Mich. Ct. App. Jan. 21, 2014) (citations omitted).

The parties agree that plaintiff meets the first and second prongs of a prima facie case. Defendant argues that the third prong (qualified for the position) is not met because plaintiff did not meet Kroger's expectations concerning her compliance with the two workplace rules at issue. The Court rejects this argument. This aspect of the prima facie case is concerned only with plaintiff's "objective qualifications, such as her education, experience in the relevant industry, and possession of the general skills required for this position." *Kulik v. Med. Imaging Res., Inc.*, 325 F. App'x 413, 414 (6th Cir. 2009). Plaintiff's violations of workplace rules are relevant to defendant's explanation for discharging her, but they have nothing to do with her qualifications for the job. Plainly, plaintiff was qualified to do the delivery receiver job.

The fourth prong is also met. Plaintiff was replaced by a male, significantly younger (twenty-eight year old) worker. Further, plaintiff indicates that employees outside the protected classes were treated more favorably than she was. Plaintiff testified that other employees, including male workers and those younger than plaintiff, routinely made purchases while on the clock and were not terminated. Defendant disputes this. For example, Kowalczyk,

7

the assistant store manager, testified that whenever she witnessed employees violating the employee purchase policy, she terminated them. Kowalczyk Dep. at 46-47. Whether plaintiff was or was not singled out in this way will be for the jury to decide.

It will also be for the jury to decide whether defendant's nondiscriminatory explanation for terminating plaintiff is credible or pretextual. Despite defendant's insistence that it discharged plaintiff for violating workplace rules, a jury might well view this explanation with great skepticism. As noted above, pretext may be found if the asserted reason is "insufficient to justify the decision." *Drazin*, 2014 WL 231918, at *3. A jury could easily conclude that no reasonable employer would discharge a highly experienced employee who, according to her most recent annual performance reviews had been "exceeding expectations," based on her alleged violation of the two cited workplace rules. One of those rules (failing to scan) plaintiff denies violating. The other (making purchases on the clock), according to plaintiff's testimony, was routinely disregarded, not only by herself but by other employees as well, with management's knowledge and approval. In short, a jury would be entitled to disbelieve Kroger's reasons for discharging plaintiff and conclude that the true reasons were discriminatory. Accordingly,

IT IS ORDERED that defendant's motion for summary judgment is denied.


Dated: September 2, 2020  
       Detroit, Michigan

s/Bernard A. Friedman  
BERNARD A. FRIEDMAN  
SENIOR UNITED STATES DISTRICT JUDGE